IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BANK OF AMERICA, N.A., not individually but derivatively on behalf of THE ESTATE OF PETHINAIDU and PARAMESWARI VELUCHAMY, | ) ) ) ) | Civil Action No. 15 CV 882 |
| | ) | Bankruptcy Case No. 11-33413 |
| Plaintiff-Appellee/ Cross-Appellant, | ) ) | Adversary Case No. 12-1715 |
| v. | ) ) | Hon. Charles R. Norgle |
| ARUN VELUCHAMY and ANU VELUCHAMY , | ) ) ) ) | |
| Defendants-Appellants/ Cross-Appellee. | ) ) | |

## AMENDED OPINION AND ORDER

CHARLES R. NORGLE, United States District Court Judge

After a long period of successfully developing a series of vertically-integrated companies in the direct marketing industry in Illinois and various companies in India, Pethinaidu Veluchamy ("Mr. Veluchamy")—aided by his wife, Parameswari ("Mrs. Veluchamy") and his children Arun and Anu—set his acquisitional sights on a bank. Then his financial troubles began. When state and federal banking regulators investigated the solvency of his bank, Mr. and Mrs. Veluchamy (collectively, "the senior Veluchamys") personally guaranteed two loans that eventually totaled approximately $43 million. They subsequently defaulted on both loans. After the creditor-bank was awarded a judgment for the deficiency and began citation proceedings, the senior Veluchamys petitioned for bankruptcy. It was later revealed that the senior Veluchamys had transferred virtually all of their assets to their children via a series of fabricated transfer forms and indemnity agreements, and the bank (now acting as estate representative) brought an adversary complaint against Arun, Anu, and the senior Veluchamys. After the bankruptcy court

found that the Veluchamys conspired to defraud their creditors and awarded a judgment to the bank for over $57 million plus stock and jewelry, Arun and Anu, and the bank filed cross-appeals. For the following reasons, the decision of the bankruptcy court is affirmed in part, reversed in part, and remanded to the bankruptcy court to enter an amended judgment consistent with this opinion.

## I. BACKGROUND

### A. The General Timeline of Events

#### 1. *An overview of the Veluchamys' relevant investing activities*

After coming to the United States from India in the 1970s, the senior Veluchamys amassed a small fortune in the direct marketing industry via the operations of fourteen interconnected entities: Fulfillment Xcellence, Inc; Creative Automation Company; Versatile Card Technology, Inc.; Qualtec, Inc.; Global Card Services, Inc.; Unique Data Services, Inc.; Unique Embossing Services, Inc.; Automated Presort, Inc. VMark, Inc. ("VMark," a holding company that owned the first seven companies); Unique Mailing Services, Inc.; Jayavilas Logistics; Veluchamy DISC[1], Inc.; Veluchamy Children's DISC, Inc.; and University Subscription Service, Inc. Seeking to diversify their holdings, the senior Veluchamys purchased Security Bank of DuPage ("Security Bank"), located in Downers Grove, Illinois, in 1995.

After the Security Bank acquisition, in 1998 the senior Veluchamys purchased First Mutual Bancorp of Illinois, Inc. ("First Mutual"). In 2004, the Veluchamys merged Security Bank into First Mutual. Shortly after that, however, the Veluchamys began to run into trouble. First Mutual began investing heavily in commercial real estate and acquisition, development, and construction loans. To fuel this growth, the bank "depended upon increasingly volatile funding

---

[1] A DISC is a domestic international sales corporation. 26 U.S.C. § 992(a). Qualifying corporations electing DISC status are not required to pay federal income tax. Id. § 991.

sources, including an extensive reliance on brokered and large time deposits, which became restricted as economic conditions deteriorated." Office of Inspector Gen., Fed. Deposit Ins. Corp., Report No. MLR-10-021, Material Loss Review of Mutual Bank, Harvey, Illinois 2 (Feb. 2010) [hereinafter "OIG Report"], available at http://www.fdicig.gov/reports10/10-021.pdf.[2] Specifically, in 2005 the Veluchamys secured a $10 million revolving line of credit with LaSalle Bank (now Bank of America or "BoA"), as well as a $10 million term loan that matured in 2010. In 2006, First Mutual (acting through the Veluchamys) received an expansion of their revolving line of credit, expanding the limit to $20 million.

Beginning in 2007, First Mutual engaged in several bad loan transactions, writing off tens of millions of dollars in uncollectible debt that had been used to secure commercial construction loans and other real estate transactions. Nevertheless, First Mutual continued to leverage itself for its lending activities, taking out another $10 million loan from BoA in February 2008. By June 2008, First Mutual's edifice—papered over with easy credit—showed signs of crumbling, indicated by the increasing percentage of its non-current loans.

At this point, the Federal Deposit Insurance Corporation ("FDIC") and the Illinois Department of Financial and Professional Regulation ("IDFPR"), which had been observing First Mutual since shortly after it had acquired Security Bank, placed First Mutual under a cease and desist order "because its overall condition warranted a corrective program to stabilize the institution and effect necessary improvements." OIG Report 14. In other words, the bank had become undercapitalized. When the BoA loans became due on November 30, 2008, First Mutual defaulted. After entering into forbearance agreements, First Mutual defaulted again on June 30, 2009. When the Veluchamys could not adequately capitalize First Mutual, IDFPR closed First

_____

[2] Although not discussed by either party, the Court takes judicial notice of governmental investigations into the Veluchamys' financial activities to aid in the development of the facts surrounding this matter. See Fed. R. Evid. 201(b)(2).

3

Mutual and named the FDIC as receiver.

## 2. *The Bank of America litigation*

On August 19, 2009, BoA filed separate lawsuits against First Mutual and the Veluchamys, which were later consolidated. See Bank of Am., N.A. v. First Mut. Bancorp of Ill., Inc., No. 09-cv-5108; Bank of Am., N.A. v. Veluchamy, No. 09-cv-5109. On December 29, 2010, the Court entered summary judgment in favor of BoA in the total amount of $39 million plus interest. Bank of Am. v. Veluchamy, Nos. 09-cv-5108, 09-cv-5109, 2010 WL 5479687, *4 (N.D. Ill. Dec. 29, 2010). BoA then began proceedings to collect on its judgment, serving citations to discover assets on the Veluchamys, First Mutual, as well as a variety of financial institutions. Initially, the senior Veluchamys claimed they had no money with which to pay the judgments, were slow to return the citation documents, and broadly attempted to claim protections offered by the Fifth Amendment in an effort to dodge answering the citation. Documents produced by the financial institutions, however, revealed that the Veluchamys transferred over $29 million out of their U.S. bank accounts, and had diluted or otherwise transferred their interest in non-cash assets to friends and family. BoA then filed an emergency motion to compel production of the senior Veluchamys' global bank account statements or transfer of cash sufficient to satisfy the judgment.

## 3. *The adversarial bankruptcy proceeding*

On August 16, 2011, approximately one day before the hearing on the status of the Veluchamys' asset disposition took place, the Veluchamys petitioned for bankruptcy. While the senior Veluchamys listed assets on their financial statement of over $500 million as of December 31, 2007, their bankruptcy petition listed a negative net worth of over $50 million. BoA filed an adversary complaint against the senior Veluchamys, Arun, Anu, and various other Veluchamy

family members and friends. After a weeklong bench trial, the bankruptcy court found that Arun and Anu had engaged in a pervasive conspiracy with their parents, who had fraudulently transferred over $57 million in cash and property, plus stock and jewelry to their children and other entities. Arun and Anu, and BoA have cross-appealed certain aspects of the bankruptcy court's decision; the facts specific to the appeal are described below.

## B. Specific Events Relevant to the Cross-Appeals From the Bankruptcy Court

Arun and Anu contend that the bankruptcy court erred in its findings and conclusions relating to the disposition of the VMark stock (Count III); the real estate located in Downers Grove, Illinois and Chennai, India (Counts VII and XII, respectively); and the disposition of stock in Appu Hotels Ltd. ("Appu") (Count XXIII). BoA, on the other hand, challenges only the court's finding relating to the amount of money ascribed to the Veluchamys in their purchase of Appu stock.

### 1. *The VMark stock transfers – Count III*

As of July 30, 2009, VMark had issued one million voting shares to its stockholders. 700,002 of those shares were held by Mrs. Veluchamy;[3] Arun and Anu each held 149,999 shares. On July 31, 2009, VMark's board of directors authorized (1) the creation of a new, non-voting class of shares and (2) a stock split, by way of a dividend, which would issue nineteen non-voting shares for every one share of voting stock. Post-stock-dividend, VMark's shares were allocated according to this table:

---

[3] On January 1, 2009, Mr. Veluchamy transferred "his entire 51 percent interest in VMark, or 510,004 voting shares, to Mrs. Veluchamy 'for and in consideration of the love and affection that [Mr. Veluchamy] bears to his wife [Mrs. Veluchamy] . . . .'" App. Appellants Arun Veluchamy and Anu Veluchamy's Opening Br. 561 [hereinafter "A&A App."].

| Shareholder | Voting Shares | Non-Voting Shares | Total |
|---|---|---|---|
| Mrs. Veluchamy | 700,002 | 13,300,038 | 14,000,040 |
| Arun | 149,999 | 2,849,981 | 2,999,980 |
| Anu | 149,999 | 2,849,981 | 2,999,980 |
| Total | 1,000,000 | 19,000,000 | 20,000,000 |

On August 19, 2009—the same day that BoA filed its litigation—VMark's board authorized the issuance of three million new shares of voting stock and thirty-eight million new shares of non-voting stock. The next day, VMark sold one million of these newly-created voting shares to Arun and Anu, 500,000 each, for a total of $630,000.00 ($315,000.00 each). After this transfer, Mrs. Veluchamy owned 66⅔% (a loss of 3⅓%), Arun and Anu each owned 16⅔% (a gain of 1⅔%), with the shares allocated according to this table:

| Shareholder | Voting Shares | Non-Voting Shares | Total |
|---|---|---|---|
| Mrs. Veluchamy | 700,002 | 13,300,038 | 14,000,040 |
| Arun | 649,999 | 2,849,981 | 3,499,980 |
| Anu | 649,999 | 2,849,981 | 3,499,980 |
| Total | 2,000,000 | 19,000,000 | 21,000,000 |

Less than two weeks later, on September 8, 2009, VMark sold an additional 1,540,000 voting shares to Arun and Anu (770,000 each) for $939,400.00 ($469,700.00 each), and 6,384,610 non-voting shares to Arun and Anu (3,192,300 each) for $3,830,760.00 ($1,915,380.00 each). After this sale, Mrs. Veluchamy owned 48.4% of VMark (a cumulative loss of 21.6%), and Arun and Anu each owned 27.8% of VMark (a cumulative gain of 10.8% each), with the shares allocated according to this table:

| Shareholder | Voting Shares | Non-Voting Shares | Total |
|---|---|---|---|
| Mrs. Veluchamy | 700,002 | 13,300,038 | 14,000,040 |
| Arun | 1,419,999 | 6,042,281 | 7,462,280 |
| Anu | 1,419,999 | 6,042,281 | 7,462,280 |
| Total | 3,540,000 | 25,384,600 | 28,924,600 |

In its decision, the bankruptcy court found that VMark was worth $57,767,275.00, and that the "VMark stock was sold to Arun and Anu with the intent to hinder, delay, or defraud creditors." In re Veluchamy, 524 B.R. 277, 291 (Bankr. N.D. Ill. 2014). The bankruptcy court looked at the transactions' characteristics, and the function of the three transactions together, and found that VMark's valuation was appropriate for several reasons. First, the bankruptcy court considered the transference of control of the corporation (treating Arun and Anu as sharing a unity of ownership) and increased VMark's value because the senior Veluchamys transferred enough shares to transfer control of the company to Arun and Anu. Second, the bankruptcy court correctly increased the present value of future cash flows by removing the Veluchamys' salaries as an outflow, reducing the amount of estimated future capital expenditures, and decreased the present value of the cash flow by including the theoretical income tax a prospective purchaser would have to pay. Third, the valuation was discounted because VMark's status as a closely-held corporation rendered it less liquid than a publicly-traded company, which reduced its overall value.

After finding that $57,767,275.00 was a fair value, the court evaluated the August 20 and September 8 transactions separately. For the August transaction, the court found that each 500,000 share issuance represented 2.381% of the total outstanding shares (500,000 / 21,000,000), and accordingly found that each transfer was worth $1,375,438 (2.381% of $57,767,275). For the September transaction, the court combined the voting and non-voting shares, and found that each 3,962,300 share issuance represented 13.699% of the total outstanding shares (3,192,300 / 28,924,600), and accordingly found that each transfer was worth $7,913,539 (13.699% of $57,767,275). In sum, the bankruptcy court found Arun and Anu jointly and severally liable for $18,577,954 ($9,288,977 each).

7

## 2. *The fraudulent real estate transfers*

### a. *The Downers Grove, Illinois properties (Count VII)*

Count VII of BoA's complaint concerns the disposition of three properties located in Downers Grove, Illinois: 5300 Katrine, 1400 Centre Circle, and 5200-5220 Thatcher (the "Downers Grove Properties"). Prior to October 2009, all three properties were held in various land trusts; the senior Veluchamys were each 50% beneficiaries of the trusts.

On October 7, 2009, the senior Veluchamys transferred approximately $2.8 million from their account at the State Bank of India in Chicago, Illinois, to Mrs. Veluchamy's account held at Canara Bank in India. On the same day, Arun and Anu formed "5300 Katrine LLC."

On October 8, 2009, Mrs. Veluchamy transferred $1.36 million from her Canara bank account into both Arun's and Anu's accounts at Canara, for a total of $2.72 million transferred out of her account. Also on this day, Mr. Veluchamy transferred $3,999,890 into an account at E*Trade Financial Corporation ("E*Trade") that was jointly owned by Arun and Anu.

On October 9, 2009, Arun and Anu transferred $2.8 million ($1.4 million each) from their accounts at Canara Bank to their joint account at E*Trade, adding to the $4 million that Mr. Veluchamy had transferred the previous day. Subsequently, on or around October 20, 2009, Arun and Anu, acting through 5300 Katrine LLC, bought the property located at 5300 Katrine Avenue, Downers Grove, Illinois for approximately $4.1 million. To fund the transaction, Arun and Anu transferred $986,000 ($493,000 each) in cash out of their E*Trade account and into their respective checking accounts. They also obtained a loan for $3.1 million secured by a mortgage on the property from Burr Ridge Bank and Trust. The senior Veluchamys used the sale proceeds to release the mortgage that had been encumbering the property; the payoff amount was $3,070,762.89. They used the remainder (the leftover equity) to pay off assorted debt incurred by

their other enterprises.

On October 23, 2009, Arun and Anu went on to form two additional real estate LLCs: 1400 Centre Circle LLC and 5200 Thatcher LLC. On December 29, 2009, Arun and Anu, acting through 1400 Centre Circle LLC, bought the property located at 1400 Centre Circle, Downers Grove, Illinois from the senior Veluchamys for $3,350,000. Similar to the Katrine transaction described above, Arun and Anu contributed $875,000 of the purchase price, and obtained a mortgage loan from Inland Bank & Trust for $2,500,000 to finance the balance of the purchase price. The senior Veluchamys paid off the $1,088,394.57 loan that had been encumbering the property and used the remaining equity to pay off debts incurred by their other businesses.

On or about March 3, 2010, Arun and Anu, acting through 5200 Thatcher LLC, bought the property located at 5200-5220 Thatcher Road from the senior Veluchamys for $3,830,000. Arun and Anu jointly contributed $1,052,000 of the purchase price, and obtained a loan from the Northern Trust Company for $2,681,000. As with the other two transactions, the senior Veluchamys paid off the debt that had been encumbering the property in the amount of $2,085,941.71 and used the remaining equity to pay off other incurred debts in connection with the Veluchamys' business activities.

Across the three properties, Arun and Anu contributed approximately $2.9 million toward the purchase of the properties. Ultimately, the bankruptcy court determined that Arun and Anu had paid more than the fair market value of the properties. It found that 5300 Katrine was worth $3,300,000; 1400 Centre Circle was worth $3,200,000; and 5200-5220 Thatcher was worth $2,800,000, for a total of $9,300,000. To determine the amount subject to avoidance by the trustee (i.e. the amount the trustee could recover from Arun and Anu), the bankruptcy judge subtracted the paid off mortgages (totaling $6,245,099.17) from the value of the property, and

entered judgment against Arun and Anu, jointly and severally in the amount of $3,054,900.83, or $1,527,450.42 each.

### b. *The Chennai, India property (Count XII)*

One of the items on the senior Veluchamys' personal financial statement as of December 31, 2007 reflected a 100% ownership of "Two Houses, Madras [now Chennai]," which were valued at $15 million.[4] A&A App. 906 at ¶ 762. On December 30, 2010, the senior Veluchamys transferred their interest in property located in Chennai, India to Arun and Anu ("the Chennai Properties") for no consideration. When BoA asked Arun if he and his sister "are the absolute owners of [the Chennai] property," Arun asserted his privilege under the Fifth Amendment. Separate App. of Appellee & Cross-Appellant 387 at 1021:16-20 [hereinafter "Pl. App."]. Anu asserted her Fifth Amendment privilege when she was asked if "[t]he deed shows that [she was] the owner of the Chennai property." Pl. App. 770 at 55:7-9. At that time, the Chennai Properties consisted of two adjoining parcels. The bankruptcy court found this transaction to be a fraudulent transfer intended to defraud their creditors, and ordered Arun and Anu to pay the fair market value of the transfer. In finding the proper valuation for the Chennai Properties, the bankruptcy court relied on the valuation opinion of BoA's expert, Berkeley Research Group ("Berkeley"). Berkeley, in turn, relied almost exclusively on a third-party valuation performed by Colliers International ("Colliers"). Using the properties' deeds as a foundation, Colliers assumed that the properties were wholly-owned by the Veluchamys, were otherwise free of encumbrances, and were in a condition suitable for redevelopment.

Colliers used two fundamental methods to calculate the properties' value: the comparable

---

[4] In 1996, the government of Tamil Nadu, India changed the city's name from Madras to Chennai. Chennai, Encyclopedia Britannica Online, http://www.britannica.com/place/Chennai (last visited Aug. 10, 2015).

sales approach and the income approach.[5] Colliers reviewed the surrounding land and zoning requirements, and determined that the highest and best use of the properties was as a high-rise condominium. Colliers examined the Chennai Properties and determined that the properties were worth 381 million rupees ("Rs.") under the comparable sales approach and Rs. 344 million under the income approach. After assigning greater weight to the comparable-sales approach to value, Colliers concluded that the Chennai Properties were worth Rs. 365 million ($8,097,890 using the December 2010 exchange rate), which was adopted by Berkeley and the bankruptcy court as the final valuation of the properties. The bankruptcy court ultimately awarded a money judgment regarding the Chennai Properties against Arun and Anu, jointly and severally, in the amount of the full value of the properties, $8,097,890.

### 3. *The fraudulent transfer of shares of stock in Appu Hotels (Count XXIII)*

As of December 31, 2007, the senior Veluchamys owned a large quantity of stock (approximately 10,569,473 shares) in Appu Hotels. On or about February 28, 2010, the senior Veluchamys transferred a total of 4,275,777 shares in Appu to Arun and Anu (the "February 2010 Transfers"). The bankruptcy court eventually found that these transfers were fraudulent and awarded a joint and several money judgment in the amount of $3,499,593.

Less than six months later, on August 2, 2010, the senior Veluchamys deposited Rs. 17 million and Rs. 14.6 million in Arun's and Anu's accounts, respectively, which were held at Canara Bank in India. That same day, both Arun and Anu transferred nearly the entire amounts (Rs. 16,880,130 and Rs. 14,529,330) to Appu. Also on August 2, 2010, Mrs. Veluchamy transferred Rs. 14,491,180 (approximately $310,000) to Appu.

---

[5] In the comparable sales approach, the appraiser determines the fair market value by researching the price of similarly-situated properties that had recently sold. In the income approach, the appraiser calculates the fair market value by deriving a present value of the property from estimating the property's potential future profit.

Subsequently, on November 24, 2010, Appu released the results of a stock issuance it had conducted. Appu issued the shares for 30 rupees each. Arun received 1,787,524 shares with a total value of Rs. 53,625,720. Anu received 1,709,164 shares with a total value of Rs. 51,274,920. Mrs. Veluchamy was not listed as a subscriber. Noting an imbalance in the amount of shares issued to Arun and Anu when compared to the amount of money they deposited with Appu, the bankruptcy court found that Mrs. Veluchamy had transferred cash to Appu in order for Appu to issue an equivalent amount in shares to Arun and Appu. Accordingly, Arun and Anu were found jointly and severally liable to the estate in the amount of $310,000. While the bankruptcy court noted an imbalance, it did not trace the origin of an extra Rs. 59 million (approximately $1,262,147) used to purchase Appu shares on behalf of Arun and Anu.[6]

## II. DISCUSSION

### Standard of Review

This Court has jurisdiction to review the decision of the bankruptcy court under 28 U.S.C. § 158(a)(1). When reviewing the bankruptcy court's decision, the Court reviews all conclusions of law *de novo*, and reviews all findings of fact for clear error. In re Bulk Petroleum Corp., No. 13-1870, 2015 WL 4591743, *4 (7th Cir. July 31, 2015); see also Fed. R. Bankr. P. 7052 (incorporating Fed. R. Civ. P. 52(a)(6) when reviewing findings of fact). As aptly put by the Seventh Circuit, the Court can only reverse a finding of the bankruptcy court for clear error if the wrong strikes the court "'with the force of a 5-week-old, unrefrigerated dead fish.'" See Cent. Mfg., Inc. v. Brett, 492 F.3d 876, 883 (7th Cir. 2007) (quoting Parts & Elec. Motors, Inc. v. Sterling Elec., Inc., 866 F.2d 228, 233 (7th Cir. 1988)).

---

[6] The total value of stock issued to Arun and Anu was Rs. 104,900,640. Arun, Anu, and Mrs. Veluchamy, however, only contributed Rs. 45,900,640, leaving a Rs. 59 million imbalance.

## A. VMark (Count III)

Arun and Anu's first five issues on appeal (they raise eleven total) concern the bankruptcy court's findings and conclusions regarding the disposition of VMark stock. Their first set of issues argues that VMark's internal dilution of its own corporate stock cannot, as a matter of law, be an indirect transfer of stock from the senior Veluchamys to their children. Their second set of issues argues that the bankruptcy court incorrectly valued VMark. Their third set of issues argues that the judgment entered against Arun and Anu was too high because (1) the bankruptcy court did not consider the amounts Arun and Anu paid in consideration for the stock issuance and (2) did not consider the equity ownership that Arun and Anu already possessed.

### 1. *VMark's internal stock dilution was an indirect fraudulent transfer of ownership*

Arun and Anu first argue that the stock that VMark issued to them is not subject to avoidance because VMark, not the senior Veluchamys, transferred the shares. Arun's and Anu's argument is essentially that because the shares did not exist until VMark (not the Veluchamys) created them, they could not be a part of the senior Veluchamys' estate and thus were not subject to avoidance.

The Bankruptcy Code allows trustees to "avoid <u>any</u> transfer . . . of an interest of the debtor in property . . . if the debtor voluntarily or involuntarily made such transfer . . . with actual intent to hinder, delay, or defraud any entity to which the debtor was or became . . . indebted." 11 U.S.C. § 548(a)(1)(A) (emphasis added). The Code defines "transfer" as, *inter alia*, "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or an interest in property." <u>Id.</u> § 101(54)(D). "The word [transfer] is used in its most comprehensive sense, and is intended to include every means and manner by which property can pass from the ownership and possession of another, and by which the result

13

forbidden by the statute may be accomplished." <u>Pirie v. Chi. Title & Trust Co.</u>, 182 U.S. 438, 444 (1901).

From reviewing the parties' briefs and the Court's own research, it appears that the Seventh Circuit has not spoken directly on whether stock dilution by the majority shareholder of a closely-held corporation constitutes a fraudulent transfer. But a district court in Texas and a bankruptcy court in Colorado have found fraudulent transfer liability in such situations. <u>See</u> <u>In re Powers</u>, Adv. No. 87-0388-H3, 1990 WL 290210 (S.D. Tex. Oct. 18, 1990), <u>aff'd</u>, 979 F.2d 1533 (5th Cir. 1992); <u>In re Dreiling</u>, 233 B.R. 848 (Bankr. D. Colo. 1999).

In <u>Powers</u>, the court found a fraudulent transferee liable when he received 1,000 shares in his debtor-brother's corporation, "which watered the Debtor's stock by 22.5%." <u>Powers</u>, 1990 WL 290210, *12. Similarly, the Bankruptcy Court for the District of Colorado held that there was no substantive difference between a debtor causing his corporation to issue new shares to a transferee and the debtor transferring already-issued shares:

> It is axiomatic that the value of the stock held by the Trustee before the issuance of the Treasury stock was considerably higher than the value immediately thereafter. This diminution of value was no less real than if Dreiling [the Debtor] had conveyed ownership of the Trustee's stock in Kearns [the corporation issuing the new shares]. Not only that, the issuance of the Treasury stock effectively transferred majority control of Kearns from the Trustee. Ownership of a majority interest in the stock of a corporation carries with it many rights and powers unavailable to minority interests. Those rights and powers are but additional sticks in the bundle of rights enjoyed by the owner of the majority interest. These ownership rights and powers were taken from the Trustee and transferred to the individual Plaintiffs.

<u>Dreiling</u>, 233 B.R. at 876. The Court is unaware of any bankruptcy case that holds that internal stock dilutions of closely held corporation <u>are</u> a legitimate method to transfer assets away from an estate.

In addition to fraudulent conveyances in a bankruptcy context, and although not an explicit component of bankruptcy jurisprudence, cases interpreting the Uniform Fraudulent

Transfer Act ("UFTA") are nonetheless instructive in interpreting the analogous provisions of the bankruptcy code because the "UFTA was an effort to harmonize state law with the Bankruptcy Code." See In re Image Worldwide, Ltd., 139 F.3d 574, 577 (7th Cir. 1998) (citing Philip I. Blumberg, Intragroup (Upstream, Cross-Stream, and Downstream) Guarantees Under the Uniform Fraudulent Transfer Act, 9 Cardozo L. Rev. 685, 695-96 (1987)).

From what the Court can discern, there is only one case discussing fraudulent transfer liability under the UFTA when a majority shareholder dilutes the stock of a closely-held corporation. In Reilly v. Antonello, 852 N.W.2d 694 (Minn. Ct. App. 2014), the judgment debtor, originally the sole owner of the 10,000 shares that comprised his corporation, "amended the corporation's articles of incorporation to authorize the issuance of 490,000 new shares of stock" to his wife. Id. at 700-01. The court found that the debtor "manipulate[d] the corporation to dilute the value of his levied 10,000 shares of stock from one-hundred-percent ownership to two-percent ownership before the sheriff's sale." Id. The court deemed this activity—using the corporation as a conduit for the transfer of his ownership—a fraudulent transfer under the UFTA.

Synthesizing the dearth of cases that interpret fraudulent conveyances in this context, the courts have consistently ignored the mere number of transferred shares (i.e. the form) in favor of determining the actual percentage of the company that the debtor caused to transfer to a third-party (the substance). These courts have also ignored the fiction that the corporation issued the shares, and have consistently viewed the corporation as the mere alter-ego of the majority shareholder in these types of fraudulent transfers. See, e.g., Reilly, 852 N.W.2d at 701 (holding that the corporation-is-a-separate-person argument "ignores the reality that [the debtor] was exclusively responsible for the actions of the corporation and that he fraudulently transferred assets to the detriment of his creditors").

Moreover, the cases cited by Arun and Anu are irrelevant at best, and actually appear to cut against their argument. Arun and Anu's discussion of <u>Freeland v. Enodis Corp.</u>, 540 F.3d 721, 740 (7th Cir. 2008) is inapplicable. In <u>Freeland,</u> the parent corporation (Enodis) directed its subsidiary (Consolidated) to issue a cash dividend and a dividend note to an intermediate subsidiary (Welbilt, Consolidated's parent). <u>Id.</u> at 727. Rather than issue the dividend as a discrete cash (or interest) payment, Enodis simply transferred the money from Consolidated's account to its own. <u>Id.</u> Consolidated's dividends therefore never rested with Welbilt. Due to product defects, Consolidated later filed for bankruptcy and the trustee subsequently sought to avoid the dividend payments to Enodis and Welbilt. <u>Id.</u> at 728. While the court in that case awarded judgment against Enodis, it did not attach liability to Welbilt because the dividend payments had already been recovered from Enodis—Welbilt's parent corporation. <u>Id.</u> at 740 ("Because Welbilt Holding did not derive a benefit from the transfers, we affirm the district court's refusal to enter judgment against Welbilt Holding."). Here, the senior Veluchamys caused VMark—of which they control 70%—to issue stock to VMark's minority shareholders— Arun and Anu. This stock issuance effectively transferred the majority interest in VMark from the senior Veluchamys to Arun and Anu. In <u>Freeland,</u> however, the entity receiving the transfer (Welbilt) was simply a conduit; it derived no independent benefit from the transfers.

Arun's and Anu's reliance on <u>In re McCook Metals, LLC,</u> 319 B.R. 570 (Bankr. N.D. Ill. 2005) is similarly misplaced: <u>McCook</u> focused on a transfer beneficiary, not a transferee (as is the case with Arun and Anu). In <u>McCook,</u> the debtor, a closely-held corporation, fraudulently transferred its right to purchase a competitor's aluminum smelter to a different entity (Longview LLC). Both entities, however, were principally owned by the same shareholder, Lynch. <u>Id.</u> at 577. In holding Lynch liable for the value of the fraudulent transfer, the court rejected Lynch's

argument that Longview LLC was the only recipient of the benefit because Lynch received an actual, quantifiable benefit in the form of his share of the asset value, and actually controlled Longview LLC. Id. at 592. As in Freeland, Longview was simply a conduit for its principal shareholder, Lynch. In this case, Arun and Anu are the principal shareholders, the two individuals that received the benefit and control that accompanies the transfer of the controlling interest in a closely-held corporation.

In this case, the undisputed facts show that the senior Veluchamys owned the majority of VMark. The senior Veluchamys used this position of control to cause VMark to issue enough new stock to Arun and Anu (who happened to be the only minority shareholders of the corporation) to make them the new majority shareholders, effectively removing the bulk of the corporation from the Estate's assets. The bankruptcy court correctly concluded that this was a fraudulent transfer transaction.

### 2. *The bankruptcy court correctly valued VMark*

Arun and Anu next argue that the bankruptcy court incorrectly valued VMark. Specifically, they argue that the senior Veluchamys did not transfer a majority position because the two transactions each separately transferred a minority interest. Because, they argue, the transfers were of a minority interest, a 35% marketability discount should apply, instead of the 15% discount that the court ordered. This higher discount would then result in a lower effective valuation of VMark. Arun and Anu cite no case law in support of their argument.

"[C]ourts generally do not elevate form over substance[, and w]here an allegedly fraudulent transfer is merely one step in a general plan, the plan must be viewed as a whole with all its composite parts taken into consideration." In re Jumer's Castle Lodge, Inc., 338 B.R. 344, 356 (Bankr. C.D. Ill. 2006) (citations omitted); see also In re Joy Recovery Tech. Corp., 286

B.R. 54, 74 (Bankr. N.D. Ill. 2002). This rule makes sense because to hold otherwise would reward a fraudulent transferor's careful planning of transferring a majority interest via a series of smaller structured transfers.

Arun's and Anu's argument would require the Court to reward scheming and deceptive behavior. The undisputed facts show that the senior Veluchamys conducted two transfers approximately nineteen days apart. The bankruptcy court found, and Arun and Anu do not challenge the fact, that the senior Veluchamys transferred their shares in an effort to remove VMark's ownership from the Estate, and therefore, its creditors. The apparent lack of case support by Arun and Anu only further dissuades the Court of the merits of their argument. The senior Veluchamys fraudulently transferred a controlling stake in VMark, and the valuation of the company correctly encompassed the transfer of control. The Court does not find any error, let alone clear error, in the bankruptcy court's findings on this issue.

3. *The bankruptcy court correctly ignored the consideration Arun and Anu paid for their issued shares of VMark, and the court properly valued the transfers*

The final argument that Arun and Anu make concerns the value of the stock transfers themselves. They argue (1) that the bankruptcy court improperly ignored the consideration they paid for their VMark shares, and (2) incorrectly valued the shares issued to Arun and Anu.

a. *Arun and Anu do not receive a setoff against the award for the consideration they paid for their shares*

Notwithstanding the rule permitting trustees to avoid fraudulent conveyances, a transferee is entitled to a setoff for the consideration paid in connection with the conveyance, where the transferee took the interest "for value and in good faith." See 11 U.S.C. § 548(c). The "for value" requirement of the setoff allowance does not require the value to be reasonably equivalent to the transferred interest. See In re Comm. Loan Corp., 396 B.R. 730, 743-44 (Bankr. N.D. Ill. 2008) (noting that the Code "contains no equivalence standard"). "Good faith" requires

18

the transferee to have engaged in the transaction without knowledge of its voidability or fraudulent nature (i.e. that the transfer was intended to defraud the transferor's creditors). See, e.g., Comm. Loan Corp., 396 B.R. at 745; Bonded Fin. Servs., Inc. v. European Am. Bank, 838 F.2d 890, 897-98 (7th Cir. 1988) ("Venerable authority has it that the recipient of a voidable transfer may lack good faith if he possessed enough knowledge of the events to induce a reasonable person to investigate.").

Without discussing the presence of good faith, Arun and Anu argue that denying the setoff is tantamount to allowing BoA a double recovery, in violation of the single satisfaction rule. But Arun and Anu appear to misunderstand the interplay between the single satisfaction rule under § 550(d) and the inability to receive an offset from a knowing participation in a fraudulent transfer scheme under § 548(c). Section 550(d) of the Code provides that "[t]he trustee is entitled to only a single satisfaction" when recovering an avoided transfer under § 550(a). 11 U.S.C. § 550(d). This rule means that for every source of funds, the trustee may only recover the entire amount once. Section 548(c), on the other hand, does not allow funds used in a fraudulent transfer to offset the fair market value of the transfer unless the transferee made the transfer for value and in good faith. Id. § 548(c); see Boyer v. Crown Stock Distrib., Inc., 587 F.3d 787, 796-97 (7th Cir. 2009) (analyzing the analogous provision under § 550(b), which uses the same standard—value and good faith—to prevent the trustee from avoiding the transfer altogether).

An illustration is helpful to understand the difference. Debtor *D* fraudulently transfers $100 to transferee *T*; *T* is aware of the transfer's fraudulent nature and gives no consideration for the $100. *T* proceeds to distribute $80 to his four friends ($20 each); each one knows of the transfers' fraudulent nature and provides no consideration for the exchange. A week later, *D*

petitions for bankruptcy protection. Pursuant to § 550(d), the eventual trustee is only entitled to recover $100, but may recover that $100 from *T* and his four friends. The trustee cannot recover $180 from the five.

But *D* also "sold" his priceless Picasso to *T* for $20. Under §§ 548(c) and 550(b)(1), the trustee would be entitled to avoid and recover the full value of the Picasso; *T* could not deduct the $20 he paid for the painting because he did not engage in the transaction "in good faith." <u>See</u> 11 U.S.C. § 548(c). The $20 *T* pays in exchange for the painting is not counted twice, the trustee (and the court) merely disregard any consideration used in connection with a knowing fraudulent transfer. The Code disallows payment offsetting to guard against rewarding a knowing participant in a fraudulent scheme. <u>See</u> <u>Nostalgia Network, Inc. v. Lockwood</u>, 315 F.3d 717, 720 (7th Cir. 2002). As the Seventh Circuit points out, disallowing such an offset will not create a creditor windfall because the debtor—not the creditors—will be the recipient of any surplus funds after all of the creditors have been paid from the estate. <u>Boyer</u>, 587 F.3d at 797 (citing 11 U.S.C. § 726(a)(6) and interpretive cases).

Arun and Anu have shown that they did indeed give value for the issued shares. But that is not why their contention fails. They cannot receive a setoff because they did not enter into the transactions "in good faith." <u>See</u> 11 U.S.C. § 548(c). While Arun and Anu appear to agree with the Code and its interpretive cases, they nevertheless argue that they should be entitled to a setoff because they made the payments to VMark, <u>not</u> to their parents. They again cite no case law to support their position,[7] and in any event, this contention is pure sophistry. Settled case law holds that the corporation is disregarded when it is used as a conduit for the controlling shareholder to

---

[7] It is not the Court's function to make the parties' arguments for them. <u>Roger Whitmore's Auto. Servs., Inc. v. Lake Cnty., Ill.</u>, 424 F.3d 659, 664 n.2 (7th Cir. 2005) ("[D]e novo review does not mean that [the Court] must make and support the parties' arguments for them."). "As we have repeated time and again, 'Judges are not like pigs, hunting for truffles buried in [the record].'" <u>Gross v. Town of Cicero, Ill.</u>, 619 F.3d 697, 702 (7th Cir. 2010) (quoting <u>United States v. Dunkel</u>, 927 F.2d 955, 956 (7th Cir. 1991)).

engage in fraud. See, e.g., Wachovia Secs., LLC v. Banco Panamericano, Inc., 674 F.3d 743, 751 (7th Cir. 2012); Reilly, 852 N.W.2d at 701. This principle still holds when a transferee-shareholder who knows about the fraudulent nature of the transaction accesses the same corporation to perpetuate the fraud. The bankruptcy court correctly disregarded Arun's and Anu's payments for the VMark shares, and the Court affirms the result on that issue.

   *b. The bankruptcy court appropriately found the value of the transferred VMark shares*

  Last, Arun and Anu claim that the bankruptcy judge improperly calculated the value of the transferred shares from VMark. While their argument is mathematically sound, it ignores the good faith required of a fraudulent transferee that seeks to reduce an avoided transfer by the amount of an in-kind exchange. See 11 U.S.C. § 548(c). The bankruptcy court determined damages from evaluating each transaction separately. The Court agrees with the prudence of that approach, and will also discuss the two transactions separately.

  Before the August 2009 transfer, Arun and Anu owned 30% of VMark, while the senior Veluchamys owned 70%. On August 19, 2009, VMark issued 500,000 new shares to both Arun and Anu (1,000,000 total). The effect of this transfer reduced the senior Veluchamys' interest in VMark by 3⅓%, and correspondingly raised Arun's and Anu's interests by the same amount. The bankruptcy court, however, found the value of that transfer was 4.762% of the total value, or $2,750,876. The bankruptcy court calculated this amount from dividing the number of issued shares (1,000,000) into the total number of issued shares (21,000,000). Arun and Anu argue that the bankruptcy court should have only awarded the bank the lower 3⅓% of the value because that was the effective interest that actually transferred from the senior Veluchamys to Arun and Anu.

  While they are correct that the effect of the transfer moved 3⅓% from the parents to the

children, it glosses over the series of transactions that, when collapsed, yielded the 3⅓% figure. Had the senior Veluchamys simply transferred 3⅓% of their interest to Arun and Anu, they would be correct. But the corporation itself (acting on behalf of the senior Veluchamys) issued the new shares, which diluted the outstanding shares. All of VMark's shareholders passively paid for this dilution, including Arun and Anu. By accepting the newly-issued shares, Arun and Anu paid value in the form of the dilution of their stock in the amount of the difference between the issued shares as a percentage of the total outstanding shares, and the actual increase in ownership they experienced (in this case, 1.429%).

So another way of looking at this transaction reveals that not only did Arun and Anu pay cash for the newly-issued shares, but that they paid in stock as well. Because their knowing participation in their parents' fraudulent scheme disentitles them to receive a setoff for the value they paid for the shares, see 11 U.S.C. § 548(c); Bonded Fin., 838 F.2d at 897-98, the bankruptcy court correctly awarded the Estate 4.762% of VMark's value for this transaction.

The September 8, 2009 transaction is different only in numbers. On that day, VMark issued 7,924,600 shares to Arun and Anu (3,962,300 each). This transaction effectively transferred 18.265% of the interest in VMark from the senior Veluchamys to Arun and Anu. The bankruptcy court again looked only at the shares issued as a percentage of the total, ignoring the net interest transfer. The bankruptcy court found that Arun and Anu received 27.398% of VMark (7,924,600 / 28,924,600), and entered judgment against them in the amount of $15,827,078 ($7,913,539 each). Here too, in consideration for the newly-issued shares Arun and Anu not only paid cash, but diluted their own shares as consideration for the transfer. Because they knowingly participated in the scheme, they are not entitled to setoff. The bankruptcy court correctly determined that the value of VMark stock issued to Arun and Anu was $18,577,954.

## B. The Fraudulent Real Estate Transactions

Arun and Anu next challenge the bankruptcy court's findings and conclusions regarding the transfer of certain real estate held by the Veluchamys that is situated in Downers Grove, Illinois and Chennai, India.

### 1. *The Downers Grove transfers (Count VII)*

Arun and Anu argue that, because they paid more than the fair market value for the Downers Grove Properties, they could not receive a benefit as a matter of law, claiming— without support—that overpayments "in the normal course [are] *prima facie* evidence that no benefit was received by the purchaser." Appellants' Opening Br. 34. But this argument does not address why the transfer of the Downers Grove Properties to Arun and Anu was not fraudulent. If anything, their argument appears to suggest that the properties were undervalued and that therefore the bankruptcy court's damages finding on this count was too low. See Appellants' Opening Br. 35 ("Further, Arun and Anu paid an additional $4,000,000 of money from their E*Trade account for the purchase of the Downers Grove Properties – an amount that actually exceeds the money judgment amount entered on Count VII.").

Section 550 of the Code allows the trustee to avoid any transfer intended to defraud the transferors' creditors. 11 U.S.C. § 550(a). A subsequent transferee can dodge the avoidance of the transfer if he can show that he took the property for value with good faith and lack of knowledge of the fraudulent nature. Id. § 550(b)(1). If he is an intermediate transferee, he could also escape liability if he can demonstrate that he never controlled the money, but was acting as a mere conduit for the transferor and the true transferee. See McCook, 319 B.R. at 590.

Neither of these defenses is applicable here. The undisputed facts show that the senior Veluchamys transferred the Downers Grove Properties to Arun and Anu. While Arun and Anu

paid value for the properties, the fact remains that they had full knowledge of what their parents were seeking to accomplish by transferring the properties. These facts, alone, are enough to defeat their proffered defense. See Bonded Fin., 838 F.2d at 897-98. Whether they—as the actual transferees of the property who took title—received some tangible benefit is irrelevant to the analysis. The bankruptcy court correctly found Arun and Anu liable to the Estate in the amount of the fair market value of the properties less the cash used to pay off the mortgages then attached to the Downers Grove Properties.

Arun and Anu also raise the issue that the bankruptcy court erred in "refus[ing] to consider *all* of the mortgage indebtedness that encumbered the Downers Grove Real Estate at the time of purchase by Arun and Anu." Appellants' Opening Br. 6. But Arun and Anu did not develop the argument any further in their brief. Consequently, the Court finds that Arun and Anu have waived whatever argument they may have made regarding this issue. See Dunkel, 927 F.2d at 956; Roger Whitmore's Auto. Servs., 424 F.3d at 664 n.2. The Court is unable to find any clear error committed by the bankruptcy court regarding the valuation of the Downers Grove Properties or Arun's and Anu's liability for accepting their transfer, and the Court affirms the bankruptcy court on this issue.

### 2. *The Chennai transfers (Count XII)*

Arun and Anu next contend that the bankruptcy court (1) erred in ordering the payment of the Chennai Properties' fair market value instead of title to the properties and (2) incorrectly valued the Chennai Properties by finding Arun and Anu liable for the entire value of the property.

#### a. *The bankruptcy court properly awarded a money judgment for the Chennai Properties instead of awarding title*

If the trustee is able to successfully avoid a fraudulent transfer of property, "the trustee

may recover, for the benefit of the estate, the property transferred, <u>or, if the court so orders, the</u> <u>value of such property</u>, from the initial transferee of such transfer. . . ." <u>See</u> 11 U.S.C. § 550(a)(1) (emphasis added). The Court reviews the bankruptcy court's decision to award money in place of the transferred property for an abuse of discretion. <u>See</u> <u>In re Keeley & Grabanski Land P'ship</u>, 531 B.R. 771, 776 (B.A.P. 8th Cir. 2015).

Here, Arun and Anu claim that the bankruptcy court incorrectly awarded a money judgment instead of ordering a turnover of the property because they did not receive a benefit from the transfer. Arun and Anu do not explain why they did not receive a benefit, and do not explain how the bankruptcy court abused its discretion in awarding a money judgment instead of a turnover of property. Accordingly, the Court finds that the bankruptcy court did not abuse its discretion in awarding money, instead of the properties themselves, to the Estate.

### b.  *The bankruptcy court properly valued the Chennai Properties*

Arun and Anu next argue that BoA's valuation expert impermissibly relied on the Colliers Report when determining the value of the Chennai Properties. They argue that the Colliers Report is unreliable because it "makes several assumptions *critical to their valuation* which are not substantiated in fact, and result in overwhelming uncertainty as to the actual value of the Chennai [Properties]." Appellants' Opening Br. 36. Arun and Anu chose not to delve into the substance of the Colliers Report's apparent assumptions, other than to say that the Report assumed that ownership (i) "was held undisputed with clear and marketable title and without any encumbrances; and (ii) that, without any verification, the Chennai Property was in a condition suitable for redevelopment." Appellants' Opening Br. 16 (internal citations omitted). Aside from challenging the assumptions, Arun and Anu broadly claim deficiencies in the report's methodology, claiming that the appraisers "failed to: (i) ascertain the actual ownership of the Chennai Property; (ii) perform a physical inspection of the Chennai Property; or (iii) have an

environmental survey or analysis performed on the Chennai Property." Id. (citations omitted).

Fatal to their argument is Arun's and Anu's failure to rebut the Colliers Report's assumptions. For example, Arun and Anu claim that they only own (or were transferred) 67% of the Chennai Properties. But their claim stops there; they do not explain who the mystery third-party owner is or provide the Court (or the bankruptcy court below) with any proof that the third-party actually owned the land. Moreover, as the bankruptcy court noted:

> Beyond the failures of these challenges on their face, many issues relating to the value of the Chennai property would be known to Arun and Anu, who owned the property since the time of the 2010 transfers. Arun, in particular, mortgaged his portion of the property. PX 234; PX 235. Yet when questioned about valuation issues, Arun and Anu both asserted their privilege against self-incrimination. Mr. Veluchamy, who might have had even more relevant information, gave noncredible testimony—contrary to all of the documentary evidence and without corroboration from any source—that he and his wife did not hold title to the property but only rented it. . . . None of the defendants provided any credible information bearing on the property's value.

Veluchamy, 524 B.R. at 322-23. The attacks on the appraisers' methodology is deficient as well. The appraisers could not ascertain the actual owners of the Chennai Properties because they could not access the documents—only the Veluchamys had those, and they refused to release them to the appraisers, raising their privilege against self-incrimination when compelled. In addition, the appraisers did not conduct a physical inspection of the property because they felt the highest and best use would be to redevelopment the properties into a condominium. Third, there were no environmental issues that would have warranted the appraisers' consideration. The inability of Arun and Anu to provide any evidence that would support their claim for a lower valuation, combined with the negative inference drawn from their blanket assertion of their privilege under the Fifth Amendment, see Lightspeed Media Corp. v. Smith, 761 F.3d 699, 705 (7th Cir. 2014), defeats their claim. Accordingly, the Court can find no clear error with the bankruptcy court's findings regarding the valuation or ownership of the Chennai Properties, and

the Court affirms on that issue.

## C. The Fraudulent Appu Hotels Stock Issuance (Count XXIII)

Both Bank of America and Arun and Anu cross-appeal the bankruptcy court's decision regarding the fraudulent transfer to Appu that led to its issuance of shares to Arun and Anu. Arun and Anu first claim that there could be no fraudulent transfer because Mrs. Veluchamy transferred the $310,000 to Appu, not themselves, while Appu (not Mrs. Veluchamy) issued the shares. According to Arun and Anu, this defeats BoA's claim for a fraudulent transfer of that $310,000.

Bank of America, on the other hand, believes that the $310,000 awarded by the bankruptcy court for Mrs. Veluchamy's role in the Appu transfers was too low. Specifically, BoA points to evidence (namely Appu's subscription report) showing that Arun and Anu actually received Rs. 104,900,640 worth of stock, Rs. 59 million (approximately $1.3 million) more than what Arun, Anu, and Mrs. Veluchamy transferred to Appu. BoA seeks a higher judgment amount consistent with the full value of the issued Appu stock. Each of the parties' arguments will be discussed in turn.

### 1. Mrs. Veluchamy fraudulently transferred $310,000 to Arun and Anu

Arun and Anu argue that the bankruptcy court improperly held that Mrs. Veluchamy's $310,000 transfer to Appu was a fraudulent transfer to them because, while Mrs. Veluchamy transferred the money directly to Appu, the number of shares linked to that $310,000 went undetermined. But when asked if their parents gave them funds to purchase Appu stock, Arun and Anu asserted their privilege against self-incrimination. Because of the negative inference drawn from such an assertion, see Lightspeed, 761 F.3d at 705, they cannot now claim that Mrs. Veluchamy's transfer did not go toward purchasing additional shares. Additionally, there is no

evidence that Mrs. Veluchamy ever received any benefit or stock issuance from her funds that she transferred to Appu.

"The trustee may recover, for the benefit of the estate, the property transferred, or if the court so orders, the value of such property, from the initial transferee of such transfer . . . ; or any immediate or mediate transferee." 11 U.S.C. § 550(a)(2). While Mrs. Veluchamy originally made her transfer to Appu, Appu then transferred the value—in the form of Appu stock—to Arun and Anu. Appu is not properly characterized as a transferee because it never exercised control over the funds. See Bonded Fin., 838 F.2d at 893-94. Instead, Mrs. Veluchamy directed Appu to issue stock to Arun and Anu, presumably in an amount equivalent to the transferred funds. Id. Accordingly, Arun and Anu are properly considered immediate transferees. Arun and Anu concede that they knew the transfers were fraudulent, and, in any event, did not pay value for the shares issued as a result of Mrs. Veluchamy's transfer. So the affirmative defense in § 550(b) cannot apply. Accordingly, the bankruptcy court properly avoided the transfer, and found Arun and Anu liable for Mrs. Veluchamy's transfer amount, $310,000.

### 2. *The bankruptcy court did not account for the full value of the fraudulent transfer*

Next, Bank of America argues that the bankruptcy court did not account for the full value of the Appu stock that was issued to Arun and Anu. BoA contends that Rs. 59 million (approximately $1.3 million) was not addressed by the bankruptcy court. Further, it says, the Veluchamys were the source of the unaccounted-for Rs. 59 million; accordingly, BoA seeks an amended judgment that awards BoA the full value of the Appu stock issued to Arun and Anu.

The record shows that on August 2, 2010, Arun, Anu, and Mrs. Veluchamy each made separate transfers to Appu. Specifically, Arun transferred Rs. 16,880,130, Anu transferred Rs. 14,529,330, and Mrs. Veluchamy transferred Rs. 14,491,180. In total, the three transferred

Rs. 45,900,640. But on November 24, 2010, when Appu released its subscriber list, it stated that Arun received 1,787,524 shares and Anu received 1,709,164 shares. See Pl. App. 642. Mrs. Veluchamy was not listed as a subscriber. Id. Appu offered each share at Rs. 30. Id. at 641. Therefore, Arun's issuance was worth Rs. 53,625,720 (1,787,524 multiplied by Rs. 30) and Anu's stock was worth Rs. 51,274,920 (1,709,164 multiplied by Rs. 30); in total, their stock was worth Rs. 104,900,640, or Rs. 59 million more than the combined total of Rs. 45,900,640 that Arun, Anu, and Mrs. Veluchamy transferred to Appu.

None of the Veluchamys provided an answer as to the source of the extra Rs. 59 million. For their part, Arun and Anu invoked the Fifth Amendment when they were asked about the source of the extra money. In their post-trial brief, Arun and Anu did not contest BoA's assertion that the entire subscription was purchased with fraudulently-transferred money. Despite her role in transferring the Estate's money to purchase Appu stock, Mrs. Veluchamy claimed that she did not know if her and her husband "provided all the money for Arun and Anu to get [the] shares." Pl. App. 360 at 401:2-5.

On appeal, Arun and Anu do not contend that the Appu subscription list is wrong, and they also cannot trace the source of the extra money used to purchase the shares. While not their burden to prove the money was not fraudulently transferred, their assertion of the privilege against self-incrimination, combined with the subscription list, permits the Court to draw the negative inference that the balance of shares that Arun and Anu did not pay for was paid for with fraudulently-transferred property. See Lightspeed, 761 F.3d at 705; Brenner v. CFTC, 338 F.3d 713, 720 (7th Cir. 2003) ("[W]e believe that the evidence offered by the [CFTC], combined with the petitioners' failure to respond to that evidence by invoking various privileges, is sufficient to support the findings of liability.").

Although the bankruptcy court found that "the amounts for which [Arun and Anu] were credited substantially exceeded the amounts that can be traced to their own deposits," the court only awarded the Estate Mrs. Veluchamy's transfer to Appu, and never made a finding regarding the disposition of the full value of the issued stock. See Veluchamy, 524 B.R. at 298. This was incorrect. Given the record and without an explanation as to the source of an extra Rs. 59 million used to buy stock for Arun and Anu, it was clear error for the bankruptcy court not to award the full amount of the transfer. Accordingly, the bankruptcy court is reversed as to the judgment awarded in Count XXIII, and is amended to award judgment to the Estate, and against Arun and Anu, jointly and severally in the amount of $1,572,147.[8]

### III. CONCLUSION

The judgment entered in Count XXIII is amended to $1,572,147 jointly and severally against Arun and Anu. For the foregoing reasons, the judgment of the bankruptcy court is affirmed in part and reversed in part.

IT IS SO ORDERED.

ENTER:

CHARLES RONALD NORGLE, Judge
United States District Court

DATE: August 27, 2015

---

[8] The Court adopts the exchange rate used by the bankruptcy court in deriving its judgment in Count XXIII, approximately Rs. 46.746/USD. See Veluchamy, 524 B.R. at 323 n.25.